UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

ARMANDO GÓMEZ-ORTIZ,

    Petitioner,

    v.

UNITED STATES OF AMERICA,

    Respondent.

Civil No. 13-1032 (JAF)

(Criminal No. 09-061)

**OPINION AND ORDER**

Petitioner Armando Gómez-Ortiz ("Gómez") moves the court under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence that we imposed in Criminal No. 09-061.[1] (ECF No. 1.) The United States opposes the motion. (ECF No. 3.) We originally dismissed the motion as time-barred. (ECF No. 7.) On appeal, the First Circuit Court of Appeals found the motion timely and then remanded it to us for consideration. (ECF No. 13.) We now review the motion on the merits, and deny it for the following reasons.

**I.**

**Background**

On February 11, 2009, Gómez and co-defendant Alexis Alverio-Meléndez ("Alverio") were each indicted on one count of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846; and one count of aiding and abetting the possession of a machinegun in furtherance of a drug-

---

[1] Because Gómez is pro se, we construe his motion liberally. *Foley v. Wells Fargo Bank*, 772 F.3d 63, 75 (1st Cir. 2014). However, "pro se status does not insulate a party from complying with procedural and substantive law." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997). When we granted Gómez's request for an evidentiary hearing, we appointed Miguel Oppenheimer, Esq., to represent him at the hearing. (ECF No. 15.)

trafficking crime in violation of 18 U.S.C. §§ 2, 924(c)(1)(A), and 924(c)(1)(B)(ii). (Crim. No. 09-061, ECF No. 14.) On May 4 and 5, 2009, Gómez and Alverio were jointly tried before a jury; they were convicted of both counts. (Crim. No. 09-061, ECF Nos. 44, 48, 52.) On August 11, 2009, this court sentenced Gómez to consecutive prison terms of sixty-three (63) months on the drug-conspiracy count and three-hundred sixty (360) months on the machinegun count, to be followed by concurrent supervised-release terms of four years on the former count and five years on the latter count. This court further sentenced Gómez to a $200 monetary assessment. We also ordered Gómez to forfeit to the United States any firearms and ammunition involved or used in the commission of the above offenses. (Crim. No. 09-061, Docket No. 65.)

Gómez appealed, arguing that the trial evidence was legally insufficient to support the convictions, that the government had committed a *Brady* violation, and that we had erred when instructing the jury about the machinegun count. *United States v. Gómez-Ortiz*, 640 F.3d 412, 416 (1st Cir. 2011). On April 1, 2011, the First Circuit unanimously affirmed both convictions. *Id.* On June 24, 2011, Gómez petitioned the United States Supreme Court for a writ of certiorari. On January 9, 2012, the Supreme Court denied the petition. *Gómez-Ortiz v. United States*, ____ U.S. ____, 132 S.Ct. 1042 (2012).

On or about December 27, 2012, Gómez, who was a federal inmate at the time, filed the instant motion by placing it in the prison mail system.[2] *See* Rule 3(d) of the Rules Governing Section 2255 Proceedings for the U.S. District Courts (inmate filing

---

[2] In its judgment remanding the motion, the First Circuit wrote that Gómez had "placed his motion in the prison mail system on December 7, 2012, less than a year" after his certiorari petition had been denied. (ECF No. 13.) That date appears to be in error. In the motion itself, Gómez avers that he placed the motion in the prison mail system on or about December 27, 2012. (ECF No. 1-1 at 17.) The date on the motion's postage stamp – December 31, 2012 – supports this later date as the actual date of filing. (ECF No. 1-4.) The motion was neither received, nor docketed, until January 15, 2013. (ECF No. 1.)

rule). On February 28, 2013, the government filed a response in opposition to the motion. (ECF No. 3.) On or about March 15, 2013, and September 9, 2013, Gómez filed supplemental papers in support of the motion. (ECF Nos. 5, 6.) On January 8, 2014, we denied the motion as time-barred. (ECF No. 7.) On May 4, 2015, the First Circuit found that the motion was timely and remanded it to us for consideration. (ECF No. 13.) On September 10, 2015, we held an evidentiary hearing to expand the record pursuant to Gómez's request in his motion papers. We now consider the motion on the merits.

## II.
## Jurisdiction

Gómez is currently incarcerated in federal prison pursuant to this court's judgment. To file a timely § 2255 motion, Gómez had one year from the date the judgment became final. 28 U.S.C. § 2255(f)(1). The judgment became final when the Supreme Court denied Gómez's petition for writ of certiorari on January 9, 2012. *Gómez-Ortiz v. United States*, ____ U.S. ____, 132 S.Ct. 1042 (2012) (denying petition); *see Butterfield v. United States*, 775 F.3d 459, 468 (1st Cir. 2015) (judgment of conviction becomes final when certiorari is denied). Because the motion was timely filed on or about December 27, 2012, we have jurisdiction to decide the motion on the merits. (ECF No. 1-1 at 17.)

## III.
## Legal Analysis

Gómez argues that his sentence must be vacated because his trial attorney was ineffective, the trial evidence was legally insufficient to support the machinegun conviction, and the underlying indictment was defective.

A.   **Ineffective Assistance of Counsel**

Gómez claims that his trial attorney was ineffective in several respects. To prove this claim:

> [Gómez] must show that his attorney's performance was deficient, and that the deficient performance prejudiced his defense. Deficient performance must fall below an objective standard of reasonableness. In determining prejudice, we look to whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. If a defendant falls short in showing either deficiency or prejudice, the claim fails.

*Ortiz-Graulau v. United States*, 756 F.3d 12, 17 (1st Cir. 2014) (internal quotations and citations omitted); *see also Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

**1. Plea Offer**

Gómez alleges that his lawyer did not successfully relay to the government his acceptance of a plea offer carrying only a twelve-year sentence and that, as a result, he instead went to trial, was convicted, and ultimately received a harsher sentence. (ECF Nos. 1-1 at 6-7, 6-1 at 1.) Of course, if Gómez's attorney had actually failed to communicate to the government his acceptance of an outstanding plea offer, that failure would constitute ineffective assistance of counsel. *See Lafler v. Cooper*, ____ U.S. ____, ____, (2012), 132 S.Ct. 1376, 1387 (2012) ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence"). On September 10, 2015, we held an evidentiary hearing to determine whether Gómez's factual allegations are credible. In the end, we find that they are not.

At the hearing, both Gómez and his trial attorney, Antonio Bauzá-Torres, Esq. ("Bauzá"), testified. Gómez alleged that he had always wanted to plead guilty in this case, but that Bauzá did not inform him of the government's plea offer until April 29, 2009, only six days before the start of trial. Gómez further alleged that when he asked Bauzá for some time to consider the plea, Bauzá told him that he had to make a decision immediately. Gómez claims that he then told Bauzá to inform the government that he wanted to reach an agreement. According to Gómez, when he appeared before this court on May 4, 2009, he was surprised to learn that he was going to trial that day, instead of accepting the government's plea offer, but that he then stayed silent about the missed plea deal throughout trial, throughout sentencing, and throughout direct appeal, where he once again retained Bauzá to represent him. On cross-examination, however, Gómez claimed instead that he had met with Bauzá two more times between April 29 and May 4, and that Bauzá had told him, during one of those meetings, that the government did not want to do the plea deal any longer.

Bauzá testified that he has been practicing the law continuously since 1964, except for during his tenure as a local Superior Court judge. His regular practice, when representing criminal defendants, includes discussing plea deals with them and comparing each deal with their post-trial sentencing exposure. In this case, the government e-mailed Bauzá a plea offer for Gómez on March 11, 2009. Bauzá and co-defendant Alverio's attorney then promptly met with Gómez and Alverio to discuss the government's offers. At that meeting, both Gómez and Alverio rejected their offer. Bauzá recalled that Gómez said that he would rather serve a life sentence than plead guilty. Bauzá further stated that Gómez had always been adamant about wanting to go to

trial. But Bauzá still advised Gómez to seriously consider the offer because it was a good one in light of the evidence against him and his post-trial sentencing exposure.

Having personally observed their live testimony and evaluated their demeanor, the court finds Bauzá's testimony credible and consistent, and Gómez's testimony incredible and contradictory. The court thus finds that when Bauzá properly informed Gómez of the government's plea offer, Gómez rejected the offer and chose to go to trial instead. Relatedly, the court discredits Gómez's allegation that he told Bauzá that he wanted to accept the offer. Although Gómez testified that he always wanted to plead guilty to the indictment and accept responsibility for his crimes, the court notes that, in his very next ineffective-assistance point, Gómez argues that he is innocent of the machinegun charge. (*See* ECF No. 1-1 at 8.) Furthermore, Gómez's allegation that Bauzá both failed and prejudiced him by neglecting to tell the government of his acceptance of the plea offer is belied by his silence about the matter, for three and one-half years, until his filing of this motion and also by his decision to retain Bauzá, once again, as his appellate attorney. Accordingly, the court finds that Bauzá's assistance to Gómez was not ineffective during the plea-bargaining process.

**2.  Fingerprint Analysis**

Gómez asserts that his attorney also rendered ineffective assistance by failing to perform a fingerprint analysis of the machinegun, the possession of which Gómez was convicted of aiding and abetting. Gómez asserts that such an analysis would have shown that his "fingerprints were not on the firearm," thereby proving that he "never possessed, nor constructively possessed, [it]." (ECF No. 1-1 at 8) (punctuation added.) But the decision by Bauzá to forgo a fingerprint analysis was neither deficient, nor prejudicial. After all, the trial evidence supporting Gómez's machinegun conviction was

overwhelming and did not turn on whether his fingerprints were on the weapon. As the First Circuit recounted when upholding the legal sufficiency of that evidence:

> Agent Alverio testified at trial that he saw [the] handgun in the "pocket" of the front passenger door [of the vehicle] when the defendants were arrested, and that Gómez was in the passenger's seat. Another government witness testified that the fanny pack that Gómez was wearing when he was arrested contained three .40 caliber bullets and a magazine containing fifteen more .40 caliber bullets, both of which could be used to fire the gun, a Glock .40 caliber pistol, as well as a slide back cover that "is the rear part of the Glock." Finally, Rodríguez testified at trial that he thought Gómez had a gun based on the way that Gómez was positioned.

*Gómez-Ortiz*, 640 F.3d at 419. Gómez nonetheless objects that his attorney, if not the government, was obligated to perform a fingerprint analysis of the Glock pistol because if the analysis did not find his fingerprints on the gun, that must mean that he never held it, which in turn must mean that he never possessed it. Because this court has frequently encountered objections like Gómez's, it is worth examining the many legal and factual errors on which they are based.

When prosecuting a charge involving the possession or use of a firearm, the government does not have a legal duty to perform a fingerprint analysis of the gun. *See id*. at 424 ("[T]he police do not have a constitutional duty to perform any particular tests") (quoting *Arizona v. Youngblood*, 488 U.S. 51, 59 [1998]). And, absent an exceptional circumstance, when the government forgoes a fingerprint analysis, a defense attorney's decision to forgo the analysis as well will not constitute ineffective assistance. To the contrary, counsel would be foolhardy, though by no means ineffective, to use her limited resources to fingerprint the weapon that her client allegedly used or possessed.

If the government has chosen not to fingerprint the firearm, perhaps because their non-forensic evidence clearly suffices, that decision does not prejudice the defendant at all. "That there [i]s no fingerprint evidence mean[s] simply that there [i]s no fingerprint evidence," neither helping, nor hurting, either side. *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005) (per Posner, J.). Defendants often fail to appreciate this. Many believe that an objectively reasonable defense lawyer would rush in to create fingerprint evidence where none had existed. But that belief clearly ignores the risks involved. At worst, the analysis will reveal the defendant's fingerprints on the gun, thereby narrowing the defenses that counsel can ethically bring and, if the government learns of the analysis, bolstering the prosecution. At best, the analysis might partially exculpate the defendant, but the possibility of finding such evidence is always "highly speculative," relying "on substantial 'ifs' and 'coulds' that are unlikely to occur": namely, if a latent print can be lifted from the gun, and "if the print [i]s usable and if it matches someone other than [the defendant], then the fingerprint . . . could [be] critical to the defense." *United States v. Gary*, 341 F.3d 829, 834 (8th Cir. 2003). Even if all those assumptions proved true in a case, the known print of another person on the gun does not necessarily exculpate the defendant because the print might only show that this other person had also possessed or used the gun. *See Hunt v. Vasquez*, 1993 U.S. App. LEXIS 3662, 1993 WL 33863, at *7 (9th Cir. Feb. 5, 1993) ("The fact that there were other fingerprints on the bag," does not prove the defendant's innocence, but "merely demonstrates that other persons handled the bag before it was tested for fingerprints."). Because the downside risk is so significant, while the upside benefits are so speculative and limited, a defense attorney, absent an exceptional circumstance, cannot be found ineffective for declining to be the first party in a gun prosecution to fingerprint the gun. *See Bucci v. United States*, 662 F.3d 18, 31 (1st

Cir. 2011) (defense counsel is "entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies") (quoting *Harrington v. Richter*, 131 S.Ct. 770, 789 [2011]).

Many defendants, however, do not argue that a fingerprint analysis would have yielded someone else's prints. Instead, like Gómez, they claim that if a latent print from their fingers cannot be found on the gun, it must mean that they never possessed it and thus are innocent of the charge. But that claim rests on a number of errors. For example, under the doctrine of constructive possession, defendants do not even have to touch a gun to be guilty of having possessed it. *United States v. Diaz*, 519 F.3d 56, 66 (1st Cir. 2008) (to show constructive possession, the government need only prove that the defendant "had dominion and control over the area where the contraband was found") (quoting *United States v. Wright*, 968 F.2d 1393, 1397 [1st Cir. 1992]); *see also id.* (finding evidence sufficient to prove that defendant had possessed the firearm and ammunition, even though "his fingerprints were not on the gun, ammunition, or clip"). Meanwhile, the most misleading factual error assumed by these claims is that guns normally retain the fingerprints of the people who use them. To the contrary, it is "extremely common" for a fingerprint analysis of a recovered firearm to find no useable prints at all. *Paladino*, 401 F.3d at 478.

Even if the gun has not been treated with a fingerprint-resistant coating, which is used to prevent rust, "[m]ost guns have textured surfaces where one handles the weapon when firing it" to "help the individual keep a firm grip on the gun." Hillart Moses Daluz, *Fundamentals of Fingerprint Analysis* (2015). But such surfaces "are not suitable for fingerprint development." *Id*. Thus, "[a] fingerprint that may be present on a trigger cannot be processed if that trigger is ribbed or textured," and "[a] palm print cannot be

1  processed on the grip of a gun if it is highly textured." *Id*. Moreover, leaving aside those
2  cases where the suspect is able to wipe down the gun before the police seize it, it is easy
3  to imagine how the rough-and-tumble handling and storage of a gun on the streets would
4  preclude the transfer of usable latent fingerprints. Under the best of circumstances, even
5  the transfer of patent prints can be difficult. *See* Hon. Alex Kozinski, *Criminal Law 2.0*,
6  44 Geo. L.J. Ann. Rev. Crim. Proc. iv n.11 (the FBI Special Agent who fingerprinted
7  Judge Kozinski for his background check took ten complete sets of fingerprints because
8  "sometimes they don't come out so clear," only to return the next week with ten more
9  fingerprint cards because none of the first prints were "any good").

10  Those are only some of the reasons why fingerprint experts have concluded that
11  "successful development of latent prints on firearms is difficult to achieve" and that, "[i]n
12  reality, very few identifiable latent prints are found on firearms." *Paladino*, 401 F.3d at
13  478 (quoting Clive A. Barnum & Darrell R. Klasey, *Factors Affecting the Recovery of*
14  *Latent Prints on Firearms*, Prosecutor, Jan./Feb. 1998, p. 32). In fact, the study cited by
15  Judge Posner, for the Seventh Circuit Court of Appeals, in the *Paladino* decision reported
16  that only about nine percent of recovered firearms have useable latent prints on them.
17  *See* Clive A. Barnum & Darrell R. Klasey, *Factors Affecting the Recovery of Latent*
18  *Prints on Firearms*, Southern California Association of Fingerprint Officers,
19  http://scafo.org/library/130303.html. This expert experience has become commonplace
20  in gun prosecutions across the nation. *See United States v. Williams*, 358 F.3d 956, 960
21  (D.C. Cir. 2004) ("The Government also introduced expert testimony to the effect that it
22  was difficult to recover a useful fingerprint from a gun and that the absence of any
23  fingerprints on the gun recovered on October 13 was not unusual."); *see also United*
24  *States v. Thomas*, 172 Fed. Appx. 970, 973 (11th Cir. 2006) ("Officer Kimberly Millen, a

forensic science specialist, . . . explained that, for a variety of reasons, including texture, it is difficult to obtain fingerprints from firearms."). Accordingly, we should expect in the vast majority of cases that a recovered firearm will not contain any useable prints, including those of the last people who used it.

Finally, post-judgment, defendants like Gómez often claim they were prejudiced at trial by the absence of a fingerprint analysis that, they assert, would have shown that their prints were not on the gun. But if the government was able to convict them of possessing or using the firearm without demonstrating that their prints were on it, "[t]he addition of a negative fingerprint analysis would not have aided the defense in any significant way." *United States v. Yarbrough*, 1990 U.S. App. LEXIS 2872, 1990 WL 17263, at *6 (6th Cir. Feb. 27, 1990). In any event, as explained above, a negative fingerprint analysis does not show that the defendant did not handle the weapon; it instead shows that, as usual, the firearm did not retain any fingerprint evidence about whether he did handle it. *See United States v. Matthews*, 498 F.3d 25, 31 (1st Cir. 2007) (finding that "[t]he absence of *any* fingerprints on the gun is not inconsistent with a finding of guilt" as to the defendant's possession of it).

In sum, absent an exceptional circumstance, if the government has not produced fingerprint evidence in a gun case, it does not constitute ineffective assistance for the defense attorney not to produce such evidence either. After all, in the vast majority of cases, the time and money spent on ordering an analysis of the gun will simply yield negative results, thereby leaving the defendant no better off than where he began – with no fingerprint evidence. *See Paladino*, 401 F.3d at 478. In those few cases where the analysis produces the latent print of another person, counsel still has the difficult task of arguing that the mere fact that someone else used or possessed the firearm shows that the

defendant did not also use or possess it. And, a defense attorney must also weigh the risk that an analysis will actually find the defendant's fingerprints on the gun. Accordingly, Gómez's attorney's decision to forgo the analysis was reasonable and non-prejudicial.

### 3. Alleged Brady material

Gómez also faults his attorney for not acquiring alleged Brady material from the government. But the alleged Brady material at issue here is a fingerprint analysis of the machinegun, which Gómez acknowledges was "not performed." (ECF No. 1-1 at 11.) *See also Gómez-Ortiz*, 640 F.3d at 424 (noting that "no fingerprint analysis was ever conducted" by the government). As the First Circuit observed when rejecting the underlying Brady claim on direct appeal: "[B]ecause no fingerprint analysis report existed, the government did not commit a Brady violation in failing to turn over such a report. The failure to create exculpatory evidence does not constitute a Brady violation." *Id.* at 424. Accordingly, counsel cannot have been deficient, nor Gómez prejudiced, by a failure to acquire from the Government evidence that did not exist.

### 4. Jury Instruction

Next, Gómez alleges that Bauzá, who also represented him on appeal, was ineffective for not claiming on appeal that our jury instruction about confidential informants was defective by virtue of not using the word "caution" when first describing how the jury should evaluate the testimony of such informants. (ECF No. 1-1 at 14.) Significantly, Gómez does not contest the substance of our instruction to the jury. (*See* Crim. No. 09-061, ECF No. 79 at 126-27) (original jury instruction.) Instead, he focuses solely on the omission of the word "caution" from our original instruction. But when the co-defendant's lawyer objected at trial to that omission, we immediately responded by further instructing the jury, "You have to be cautious when you receive this testimony,

and you have to look at the complete record, at all the evidence, to figure out whether in light of all the other evidence in the case, whether what the confidential informant told you is something you have to rely on." (Crim. No. 09-061, ECF No. 79 at 128.)  When we then asked defense counsel whether they had "[a]nything else" to add, the co-defendant's lawyer replied, "Not from our part, Your Honor." (Crim. No. 09-061, ECF No. 79 at 128.)  This response indicated that counsel had found our response sufficient to cure their initial objection.  Because our supplemental jury instruction cured the error, if any, in the original instruction, Gómez's attorney was not ineffective for declining to pursue this claim on appeal.  *See Acha v. United States*, 910 F.2d 28, 32 (1st Cir. 1990) (failure to raise meritless claims does not constitute ineffective assistance of counsel).

**B.      Legal Sufficiency of Trial Evidence**

In supplemental papers filed on or about September 9, 2013, Gómez claims that the evidence supporting his machinegun conviction under 18 U.S.C. § 924(c)(1) was legally insufficient.  Specifically, he now argues, for the first time, that the trial evidence did not prove his "knowledge [that] the weapon seized had the characteristics of an automatic weapon." (ECF No. 6 at 13.)  When the First Circuit held the evidence legally sufficient, *see Gómez-Ortiz*, 640 F.3d at 419-20, it did not address this particular claim because Gómez had not raised it.  By failing to raise the claim on direct appeal, it has been procedurally defaulted and "may be raised in habeas only if [Gómez] can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Damon v. United States*, 732 F.3d 1, 4 (1st Cir. 2013) (quoting *Bousley v. United States*, 523 U.S. 614, 622 [1998]).  Gómez does not argue that either of these exceptional circumstances applies to him.  Thus, the claim remains defaulted.  In any event, the claim

is also meritless because the government was not required to prove that Gómez knew that the firearm he possessed was a machinegun.

In *United States v. Shea*, 150 F.3d 44 (1st Cir. 1998), the defendant challenged his conviction under 18 U.S.C. § 924(c)(1) on the ground that the district court had failed "to instruct the jury that he must have [had] knowledge of the features of the [gun he was accused of carrying] which brought it within the scope of the assault weapons provision of § 924(c)(1)." *Id*. at 51. In particular, the defendant argued that knowledge "of the gun's features" must be an element of § 924(c)(1) because the Supreme Court had held, in *Staples v. United States*, 511 U.S. 600 (1994), that such knowledge was an element of a conviction under 26 U.S.C. § 5861(d), which "prohibited possession of certain types of firearms but was silent as to the mental state required for the commission of the offense." *Shea*, 150 F.3d at 51-52. The First Circuit unanimously rejected the defendant's challenge, holding that § 924(c)(1) did not require proof that he had "knowledge of the features of the . . . weapon" that triggered the statute because § 924(c)(1) is a "sentencing enhancement" and not a "separate offense." *Id*. The Court explained that, unlike 26 U.S.C. § 5861(d) which "criminalize[d] a broad range of apparently innocent conduct" without an explicit *mens rea* requirement, "the § 924(c) defendant whose sentence is enhanced based on the type of weapon he carried has [already] demonstrated a 'vicious will' by committing the principal offense." *Id*. at 52 (quoting *United States v. Brantley*, 68 F.3d 1283, 1289-90 [11th Cir. 1995]). Accordingly, the trial evidence here was not legally insufficient because the government, following the First Circuit's holding in *Shea*, did not need to prove that Gómez knew that the gun he possessed was a machinegun.

Gómez nonetheless argues that the First Circuit's later ruling in *United States v. Nieves-Castano*, 480 F.3d 597 (1st Cir. 2007), now requires proof of such knowledge.

(ECF No. 6 at 10-11, 13.) But that argument is unavailing because the statute at issue in *Nieves-Castano* was, like 26 U.S.C. § 5861(d) in *Staples*, a standalone offense without an explicit *mens rea* requirement, instead of a sentencing enhancement that builds upon the *mens rea* requirement of the principal offense. In *Nieves-Castano*, the First Circuit was construing 18 U.S.C. § 922(o), a statute that makes it "unlawful for any person to transfer or possess a machinegun." 480 F.3d at 599 (quoting 18 U.S.C. § 922[o]). Because that statute does not have an express *mens rea* element, the government conceded on appeal that "*Staples*'s scienter requirement," of "knowledge of the characteristics that br[ing] the gun within the statutory definition" of a machinegun, also applies to prosecutions under 18 U.S.C. § 922(o)." *Id*. at 599-600 (citing *Staples*, 511 U.S. at 602). And, the *Staple*'s scienter provision was precisely what the First Circuit, in *Shea*, held does not apply to convictions under 18 U.S.C. § 924(c)(1). *Shea*, 150 F.3d at 51-52. Accordingly, the trial evidence in this case remains legally sufficient. *See Gómez-Ortiz*, 640 F.3d at 420.

**C.    Legal Sufficiency of Indictment**

In supplemental papers filed on or about March 19, 2013, Gómez claims, for the first time, that the indictment on which he was tried and convicted was defective because it failed to allege that his criminal conduct had affected interstate or foreign commerce. (ECF No. 5.) Defendant asserts that affecting commerce is an "element" of each crime charged in the indictment. (ECF No. 5.) Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Gómez was required to raise this claim in a pretrial motion. By failing to do so, he forfeited his ability to raise it absent a showing of "good cause." Fed. R. Crim. P. 12(c)(3). And he has not made such a showing. In any event, the claim is unavailing.

It is well-settled law that "an indictment 'must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States*

*v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010) (quoting Fed. R. Crim. P. 7[c][1]).  "An indictment that tracks the language of the underlying statute generally suffices to meet this standard," so long as it "notifies the [accused] not only of the elements of the crimes charged but also of the relevant factual scenario."  *Id.* at 35.  Here, the indictment sufficiently tracked the underlying statutory language and adequately notified Gómez of the facts alleged against him.  (ECF No. 14.)  Gómez does not contend otherwise.

Instead, Gómez focuses his complaint on the indictment's failure to allege that his criminal conduct affected "interstate or foreign commerce."  (ECF No. 5 at 1.)  But, unlike the statutes at issue in *United States v. Spinner*, 180 F.3d 514 (3rd Cir. 1999) (construing 18 U.S.C. § 1029[a]), and *United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988) (construing 18 U.S.C. § 1962[c]), the cases on which Gómez relies, the statutes at issue here do not possess an element requiring proof of such an effect.  *See Gómez-Ortiz*, 640 F.3d at 418-19 (setting forth the elements of 21 U.S.C. §§ 841[a][1] and 846, and of 18 U.S.C. § 924[c][1][A]).  Although Gómez correctly points out that 18 U.S.C. § 924(b) does contain such an element (ECF No. 5 at 1), the indictment did not charge him with that offense. (ECF No. 14.)  In sum, the indictment was not defective for failing to allege something that was not an element of the charged crimes.  *See generally Troy*, 618 F.3d at 34-35.

## IV.

## **Certificate of Appealability**

When entering a final order denying a motion under 28 U.S.C. § 2255, we must also decide whether to issue a certificate of appealability ("COA").  Rule 11(a) of the Rules Governing Section 2255 Proceedings for the U.S. District Courts.  We may grant a COA only upon "a substantial showing of the denial of a constitutional right."  28 U.S.C.

§ 2253(c)(2).  To make this showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 [2000]).  Although Gómez has not yet requested a COA, we conclude that reasonable jurists could not disagree with our assessment of his constitutional claims.  Accordingly, we deny him a COA.  Gómez may still seek a COA from the First Circuit pursuant to Federal Rule of Appellate Procedure 22.

## IV.
## Conclusion

For the foregoing reasons, we hereby **DENY** Gómez's § 2255 motion.  (ECF No. 1.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 16th day of September, 2015.

S/José Antonio Fusté
JOSE ANTONIO FUSTE
U. S. DISTRICT JUDGE
